1   Lauren A. Dean, Esq. (SBN 174722)
    *lauren@magdeanlaw.com*
2   MAGNANIMO DEAN LAW, APC
    5850 Canoga Ave., Suite 400
3   Woodland Hills, California 91367
    Telephone:   (818) 305-3450
4   Facsimile:    (818) 305-3451

5   Attorney for Plaintiff:
    Naren Suri

6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10

11   NAREN SURI, Derivatively on Behalf          Case No.:
     of C3.AI, INC.,
12
                    Plaintiff,
13
                    v.                            **VERIFIED SHAREHOLDER
14                                                DERIVATIVE COMPLAINT**

15   THOMAS M. SIEBEL, PATRICIA A.
     HOUSE, RICHARD LEVIN,
16   MICHAEL G. MCCAFFERY,                        **DEMAND FOR JURY TRIAL**
     CONDOLEEZZA RICE, S.
17   SHANKAR SASTRY, BRUCE
     SEWELL, STEPHEN M. WARD JR,
18   LISA A. DAVIS, JIM H. SNABE,
     AND DAVID BARTER,
19
                    Defendants,
20
                    -and-
21
22   C3.AI, INC.,

23                  Nominal Defendant.
24

25

26       Plaintiff Naren Suri, by and through his undersigned counsel, derivatively on

27   behalf of Nominal Defendant C3.ai, Inc. ("C3.ai" or the "Company"), submit this

28   Verified Shareholder Derivative Complaint (the "Complaint").  Plaintiff's allegations

---

                                         1

are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by C3.ai with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action brought in the right, and for the benefit, of C3.ai.

2.     C3.ai operates as an enterprise artificial intelligence ("AI") software company.  The Company offers a variety of software-as-a-service ("SaaS") applications for enterprises and software solutions and integrated turnkey enterprise AI applications for oil and gas, chemicals, utilities, manufacturing, financial services, defense, intelligence, aerospace, healthcare, and telecommunications market segments.

3.     On November 13, 2020, the Company filed a registration statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on December 8, 2020 (the "Registration Statement").

4.     On December 9, 2020, pursuant to the Registration Statement, the Company's Class A common stock began publicly trading on the New York Stock Exchange ("NYSE") under the trading symbol "AI".  That same day, the Company filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus" and, collectively with the Registration Statement, the "Offering Documents").

5.     Pursuant to the Offering Documents, the Company issued 15.5 million shares of its Class A common stock to the public at the Offering price of $42.00 per share for approximate proceeds to the Company of $610 million after applicable underwriting discounts and commissions.

///

6.     The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Further, throughout the Relevant Period, Defendants caused the Company to make materially false and misleading statements regarding the Company's business, operations, and compliance policies.

7.     Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) the Company's partnership with Baker Hughes was deteriorating; (ii) the Company's was employing a flawed accounting methodology to conceal the deterioration of its Baker Hughes partnership; (iii) the Company faced challenges in product adoption and significant salesforce turnover; (iv) the Company overstated, *inter alia*, the extent of its investment in technology, description of its customers, its total addressable market ("TAM"), the pace of its market growth, and the scale of alliances with its major business partners; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

8.     On February 16, 2022, Spruce Point Capital Management ("Spruce Point") issued a report and strong sell research opinion regarding the Company (the "Spruce Point Report").

9.     The Spruce Point alleged that it had uncovered: "[e]vidence of a severely challenged partnership with Baker Hughes, a related-party and C3.ai's largest customer"; "[s]igns of problematic financial reporting and accounting regarding the Baker Hughes joint venture and a revolving door in C3.ai's Chief Financial Officer position"; that "[c]hallenges in product adoption and significant salesforce turnover make it unlikely that C3.ai will meet aggressive analyst estimates"; "[e]vidence of exaggerated or irreconcilable claims made by C3.ai[,]" including "numerous discrepancies" regarding "the value of and cumulative investment made by C3.ai in its technology, description of its customers, its total addressable market ('TAM'), the pace of its market growth and the scale of alliances with companies such as Microsoft,

Hewlett Packard Enterprises, Google Cloud, Intel and Amazon Web Services"; and "*[w]orrisome corporate governance practices* and insider enrichment." As a result, Spruce Point "conservatively estimate[d] 40% - 50% downside risk to C3.ai's share price."

10. Following publication of the Spruce Point Report, the Company's stock price dropped $1.01 per share, or 3.93%, to close at $24.70 per share on February 16, 2022.

<u>**JURISDICTION**</u>

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the securities class actions entitled *The Reckstin Family Trust v. C3.ai Holdings, Inc., et al.*, Case 4:22-cv-01413-HSG (N.D. Cal.) (the "Securities Class Action") based on violations of the Exchange Act.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. In addition, the Company's principal executive offices are in this District.

<u>**THE PARTIES**</u>

<u>**Plaintiff**</u>

15. Plaintiff is, and was at relevant times, a shareholder of C3.ai. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation. Plaintiff currently holds C3.ai shares as of the filing of this Complaint.

4

**Nominal Defendant**

16.    ***Nominal Defendant*** C3.ai is a Delaware corporation with principal executive offices located at 1300 Seaport Boulevard, Suite 500, Redwood City, California 94063.

**Defendant Directors**

17.    ***Defendant Thomas M. Siebel*** ("Siebel") has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") at all relevant times.  Defendant Siebel signed or authorized the signing of the Registration Statement filed with the SEC.  Defendant Siebel is a defendant in the Securities Class Action.

18.    ***Defendant Patricia A. House*** ("House") has served as a Director of the Company at all relevant times.  Defendant House signed or authorized the signing of the Registration Statement filed with the SEC.  Defendant House is a defendant in the Securities Class Action.  Defendant House is a member of the Compensation Committee.

19.    ***Defendant Richard Levin*** ("Levin") has served as a Director of the Company at all relevant times.  Defendant Levin signed or authorized the signing of the Registration Statement filed with the SEC.  Defendant Levin is a defendant in the Securities Class Action.  Defendant Levin is a member of the Audit Committee.

20.    ***Defendant Michael G. McCaffery*** ("McCaffery") has served as a Director of the Company at all relevant times.  Defendant McCaffery signed or authorized the signing of the Registration Statement filed with the SEC.  Defendant McCaffery is a defendant in the Securities Class Action.  Defendant McCaffery is the Chairman of the Audit Committee.

21.    ***Defendant Condoleezza Rice*** ("Rice") has served as a Director of the Company at all relevant times.  Defendant Rice signed or authorized the signing of the Registration Statement filed with the SEC.  Defendant Rice is a defendant in the Securities Class Action.

22.    **Defendant S. Shankar Sastry** ("Sastry") has served as a Director of the Company at all relevant times. Defendant Sastry signed or authorized the signing of the Registration Statement filed with the SEC.  Defendant Sastry is a defendant in the Securities Class Action.

23.    **Defendant Bruce Sewell** ("Sewell") has served as a Director of the Company at all relevant times. Defendant Sewell signed or authorized the signing of the Registration Statement filed with the SEC.  Defendant Sewell is a defendant in the Securities Class Action.  Defendant Sewell is a member of the Compensation Committee.

24.    **Defendant Stephen M. Ward Jr.** ("Ward") has served as a Director of the Company at all relevant times.  Defendant Ward signed or authorized the signing of the Registration Statement filed with the SEC.  Defendant Ward is a defendant in the Securities Class Action.  Defendant Ward is the Chair of the Compensation Committee.

25.    **Defendant Lisa A. Davis** ("Davis") has served on the Board since December 2021.  Defendant Davis is a member of the Audit Committee.

26.    **Defendant Jim H. Snabe** ("Snabe") has served as a member of our board of directors since February 2021.

27.    Defendants Siebel, House, Levin, McCaffery, Rice, Sastry, Sewell, Ward, Davis and Snabe are collectively referred to hereinafter as the "Director Defendants."

**Officer Defendant**

28.    **Defendant David Barter** ("Barter") has served as the Company's Senior Vice President and Chief Financial Officer ("CFO") at all relevant times.  Defendant Barter signed or authorized the signing of the Registration Statement filed with the SEC. Defendant Barter is a defendant in the Securities Class Action.

29.    The Director Defendants and Defendant Barter are collectively referred to herein as the "Individual Defendants".

///

///

## CODE OF BUSINESS CONDUCT AND ETHICS

30.     As members of the Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

31.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Individual Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

33.     The Individual Defendants owe to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

34.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the

officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

35.    Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its

property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

36.     The Individual Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, C3.ai has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

### THE COMPANY'S AUDIT COMMITTEE CHARTER

37.     Pursuant to the Company's Audit Committee Charter:

The purpose of the Audit Committee (the "Committee") of the Board of Directors of C3.ai, Inc. (the "Company") is to:

- ***oversee the Company's accounting and financial reporting processes, systems of internal control, financial statement audits and the integrity of the Company's financial statements***;

- oversee the selection, engagement terms, fees, qualifications, independence, and performance of the registered public accounting firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors");

- maintain and foster an open avenue of communication with the Company's management, and Auditors;

- review any reports or disclosures required by applicable law and stock exchange listing requirements;

- help the Board oversee the Company's legal and regulatory compliance, including risk assessment; and

- provide regular reports and information to the Board.

***

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**Financial Review and Disclosure**:

5.      **Annual Audit Results**. The Committee will review with management and the Auditors the results of the Company's annual financial statement audit, including:

- the Auditors' assessment of the quality of the Company's accounting principles and practices;

- the Auditors' views about qualitative aspects of the Company's significant accounting practices and the reasonableness of significant judgments and estimates (including material changes in estimates and analyses of the effects of alternative GAAP methods on the financial statements);

- all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial);

- the adequacy of the disclosures in the financial statements; and

- any other matters that the Auditors must communicate to the Committee under applicable accounting or auditing standards.

6.      **Audited Financial Statement Review; Quarterly and Annual Reports**. The Committee will review the annual audited financial statements, the quarterly financial statements and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditors. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K.

7.      **Proxy Report**. After the Public Effective Date, the Committee will oversee the preparation of any report of the Committee required by applicable law or stock exchange listing requirements to be included in the Company's annual proxy statement.

8.      **Accounting Principles and Policies**. The Committee will review and discuss with management and the Auditors significant issues regarding accounting principles and financial-statement presentation, including:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- critical accounting policies and practices;

- alternative accounting policies available under GAAP;

- the potential impact on the Company's financial statements of alternative treatments and any off-balance sheet structures; and

- any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on the Company's financial statements, compliance programs, and policies.

The Committee will review with the Auditors and management, if appropriate, any written communication, such as any management letter or internal-control letter, and monitor management's response to such communications. The Committee will discuss with the Auditors the matters required to be discussed by Auditing Standard No. 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB) on at least an annual basis, to the extent required by such rules.

***

11.     **Internal Control over Financial Reporting; Disclosure Controls**. The Committee will confer with management and the Auditors concerning the scope, design, adequacy and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and, to the extent necessary, any remediation plans or special audit steps adopted in light of any material control deficiencies.

## SUBSTANTIVE ALLEGATIONS

**Background**

38.     The Company operates as an enterprise AI software company. The Company offers a variety of SaaS applications for enterprises, as well as software solutions and integrated turnkey enterprise AI applications for oil and gas, chemicals,

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

utilities, manufacturing, financial services, defense, intelligence, aerospace, healthcare, and telecommunications market segments.  The Company also has purported strategic partnerships with Baker Hughes related to oil and gas markets; FIS related to financial services markets; Raytheon; and AWS, Intel, and Microsoft.

39.     On November 13, 2020, the Company filed the Registration Statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on December 8, 2020.

40.     On December 9, 2020, pursuant to the Registration Statement, the Company's Class A common stock began publicly trading on the NYSE under the trading symbol "AI".  That same day, the Company filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

41.     Pursuant to the Offering Documents, the Company issued 15.5 million shares of its Class A common stock to the public at the Offering price of $42.00 per share for approximate proceeds to the Company of $610 million after applicable underwriting discounts and commissions.

## **FALSE AND MISLEADING STATEMENTS**

42.     In providing an overview of the Company, the Offering Documents stated:

**Extensive Partner Ecosystem**

We have established strategic relationships with technology leaders including AWS, Baker Hughes, Fidelity National Information Services, or FIS, Google, IBM, Microsoft, and Raytheon. These world-leading technology companies can marshal tens of thousands of talented resources to establish and serve small, medium, and large C3.ai customer relationships at global scale.

*** 

**Sales Alliances**

Strategic partnerships are core to our growth strategy with market-leading companies offering highly leveraged distribution channels to various markets.

To date, we have established such a partnership with Baker Hughes to address the needs of the global oil and gas market, with FIS to address needs in the financial services market, with Raytheon to serve the U.S. defense and intelligence communities, and with Microsoft and Adobe to address the next generation of CRM.

In addition, we have announced global alliances with AWS, IBM, Intel, and Microsoft to jointly market, sell, and service our combined solutions across industry verticals.

In the majority of our sales opportunities we are aligned with one or more of these partners.

*** 

**Growth Strategy**

We are substantially investing in the expansion of our direct enterprise sales and service organization both geographically and across vertical markets to expand the use of C3.ai solutions within existing customers and establish new customer relationships.

We will continue to focus on the success of our customers to increase penetration of our existing customer base.

We will continue to expand our major account sales organization to focus on large enterprise software agreements.

We will continue to expand our enterprise sales organization globally, focused on divisions of Fortune 500 companies as well as with smaller and medium-sized businesses.

We will expand our leveraged distribution channel with additional strategic partners like Baker Hughes, FIS, Microsoft, and Raytheon.

We will continue to develop high volume distribution channels including digital marketing, telesales, and strategic distributors, particularly to address the needs of small and medium businesses.

We are bringing new product families to market that we believe will develop into substantial recurring revenue streams for C3.ai.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

We expect to enter into additional strategic development and distribution agreements, like those we have in place with Baker Hughes, FIS, Microsoft, and Raytheon, that we expect will provide us highly leveraged access to other vertical and horizontal markets.

43.    In describing the Company's "Go-to-Market Strategy," the Offering Documents stated:

Our go-to-market strategy is focused on large organizations recognized as leaders in their respective industries or public sectors, and who are attempting to solve complicated business problems by digitally transforming their operations. These large organizations, or lighthouse customers, include companies and public agencies within the oil and gas, power and utilities, aerospace and defense, industrial products, and financial services industries, among others. This has resulted in C3.ai powering some of the largest and most complex Enterprise AI applications worldwide. These lighthouse customers serve as proof points for other potential customers in their particular industries. Today, we have a customer base of a relatively small number of large organizations that generate high average total subscription contract value, but we expect that, over time, as more customers adopt our technology based on the proof points provided by these lighthouse customers, the revenue represented by these customers will decrease as a percentage of total revenue. As our AI Suite is industry agnostic, we also expect to expand into other industries as we grow. For example, for the fiscal year ended April 30, 2018, revenue from customers in the financial services, oil and gas, aerospace and defense, manufacturing, and utilities industries represented 0%, 1%, 3%, 29%, and 67% of our total revenue, respectively, and in the six months ended October 31, 2020, revenue from these customers represented 10%, 30%, 16%, 20%, and 25% of our total revenue, respectively.

As of October 31, 2020, we had 30 Entities and 64 customers. While almost all our Entities represent large revenue commitments, our top two Entities each represented over 10% of our total revenue for the fiscal year ended April 30, 2020.

Acquiring new customers and further penetrating our existing customers is the intent of our go-to-market effort and drivers of our growth. Making new and existing customers successful is critical to our long-term success.

After we help our customers solve their initial use cases, they typically identify incremental opportunities within their operations and expand their use of our products by either purchasing additional C3 AI Applications or by subscribing to the C3 AI Suite to develop their own AI applications.

The size and sophistication of our customers' businesses demonstrate the flexibility, speed, and scale of our products, and maximize the potential value to our customers. To be a credible partner to our customers, who often are industry leaders, we deploy a motivated and highly educated team of C3 personnel and partners. We go-to market primarily leveraging our direct sales force, and during the fiscal year ended April 30, 2020, we substantially increased the number of direct sales resources. We also complement and supplement our sales force with a number of go-to-market partners.

- *Strategic Vertical Industry Partners*. We have developed an alliance program to partner with recognized leaders in their respective industries, such as Baker Hughes, Fidelity National Information Services, or FIS, and Raytheon, to develop, market, and sell solutions that are natively built on or tightly integrated with the C3 AI Suite.
- *Consulting and Services Partners*. As part of a global industry alliance, we partner with IBM Global Services, as well as a number of systems integrators specializing in Enterprise AI implementations.
- *Hyperscale Cloud and Infrastructure*. We have formed global strategic go-to market alliances with hyperscale cloud providers including Amazon, FIS, Google, and Microsoft. In addition, we have strategic alliances with leading hardware infrastructure providers to deliver our software optimized for their technology.

These partners include Hewlett Packard Enterprise, and Intel. These partners supply infrastructure solutions, data management and processing services, or hardware and networking devices (e.g. IoT gateways) to support C3.ai product implementations and complement C3.ai's products.

\*\*\*

In addition to the activities of our field sales organization, our success in attracting new customers will depend on our ability to expand our ecosystem of strategic partners and the number of industry verticals that

they serve. Our strategic go-to-market alliances vastly extend our reach globally. Some of our most notable partners include Baker Hughes, FIS, IBM, and Microsoft. Each strategic partner is a leader in its industry, with a substantial installed customer base and extensive marketing, sales, and services resources that we can leverage to engage and serve customers anywhere in the world. Using our AI Suite as the development suite, we leverage our model-driven architecture to efficiently build new cross-industry and industry-specific applications based on identifying requirements across our customer base of industry leaders and through our industry partners. Our strategy with strategic partners is to establish a significant use case and prove the value of our AI Suite with a flagship customer in each industry in which we participate. We have done this with our strategic vertical industry partner in oil and gas, Baker Hughes, as well as with our iconic global customers, some of whom are deploying C3.ai technology to optimize thousands of critical assets globally across their upstream, midstream, and downstream operations. We establish formal sales and marketing plans with each partner, including specific sales goals and dedicated budgets, and we work closely with these partners to identify specific target accounts. We intend to grow the business we do with each partner and to add more partners as we expand the vertical markets we serve. We also offer revenue generating trials of our applications as part of our customer acquisition strategy.

In June 2019, we entered into a three-year arrangement with Baker Hughes as both a leading customer and as a partner in the oil and gas industry. This arrangement included a subscription to our AI Suite for their own operations (which we refer to below as direct subscription fees), the exclusive right for Baker Hughes to resell our offerings worldwide in the oil and gas industry, and the non-exclusive right to resell our offerings in other industries. Under the arrangement, Baker Hughes made minimum, non-cancelable, total revenue commitments to us of $50.0 million, $100.0 million, and $170.0 million, which are inclusive of their direct subscription fees of $39.5 million per year, for each of the fiscal years ending April 30, 2020, 2021, and 2022, respectively, with the remainder to be generated from the resale of our solutions by the Baker Hughes sales organization.

During the fiscal year ended April 30, 2020, we recognized as revenue the full value of the first year of the direct subscription agreement and the value of deals brought in by Baker Hughes through the reseller arrangement. This arrangement was revised in June 2020 to extend the term by an additional two years, for a total of five years, with an expiration

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

date in the fiscal year ending April 30, 2024 and to modify the annual amount of Baker Hughes' commitments to $53.3 million, $75.0 million, $125.0 million, and $150.0 million, which are inclusive of their revised direct subscription fees of $27.2 million per year over the fiscal years ending April 30, 2021, 2022, 2023, and 2024, respectively. Any shortfalls against the total annual revenue commitment made to us by Baker Hughes will be assessed and recorded by us at the end of the fourth quarter of each fiscal year. We are obligated to pay Baker Hughes a sales commission on subscriptions to our products and services offerings it resells in excess of these minimum revenue commitments.

Our RPO related to Baker Hughes, which includes both direct subscriptions and reseller arrangements, is comprised of $19.9 million related to deferred revenue and $20.0 million from non-cancellable contracts as of April 30, 2019, $2.4 million related to deferred revenue and $84.8 million from non-cancellable contracts as of April 30, 2020, and $16.9 million related to deferred revenue and $91.9 million of commitments from noncancellable contracts as of October 31, 2020.

As of July 31, 2019, October 31, 2019, January 31, 2020, April 30, 2020, July 31, 2020, and October 31, 2020 the total remaining amount of Baker Hughes' minimum revenue commitments not yet contracted under the direct subscription fee or reseller arrangement, and thus subject to the shortfall annual provisions, under the entire arrangement was $194.0 million, $195.0 million, $190.3 million, $183.8 million, $270.9 million, and $249.9 million, respectively.

44.     Also, in discussing the Company's TAM, the Offering Documents stated:

**Large Total Addressable Market**

We serve a large and rapidly growing market, estimated to be $174 billion in 2020, growing to $271 billion in 2024, based on IDC and Gartner reports.

Our total addressable market, or TAM, comprises multiple enterprise software segments that are growing at a combined compound annual growth rate, or CAGR, of 12%:

- *Enterprise AI Software*. According to IDC, the relatively new but rapidly growing global Enterprise AI software market totaled $18

billion in 2020, and will grow to $44 billion in 2024—a 24% CAGR.7 We address this market with our AI Suite and full portfolio of AI Applications.

- *Enterprise Infrastructure Software*. The C3 AI Suite replaces a wide range of existing enterprise infrastructure software categories, including Application Development, Application Infrastructure and Middleware, Data Integration Tools and Data Quality Tools, and Master Data Management Products. According to Gartner, the size of the infrastructure software market across these four segments totaled $63 billion in 2020, and will grow to $82 billion in 2024—a 7% CAGR.

- *Enterprise Applications*. C3 AI Applications address a wide range of Analytics and Business Intelligence use cases as well as the Customer Experience and Relationship Management (CRM) segment. According to Gartner, the size of the software market across these segments totaled $93 billion in 2020, and will grow to $145 billion in 2024—a 12% CAGR. C3.ai is an active participant in the Enterprise AI/ML, Data Analytics, Cloud Computing, and Digital Transformation markets. According to IDC, by 2022, 65% of CIOs will digitally empower and enable front-line workers with data, AI, and security and by 2025, 80% of CIOs alongside lines-of-business will implement intelligent capabilities to sense, learn, and predict changing customer behaviors

45.     In discussing the Company's "extensive partner ecosystem," the Offering Documents stated:

We have established strategic relationships with technology leaders including Amazon Web Services, or AWS, Baker Hughes, Fidelity National Information Services, or FIS, Google, IBM, Microsoft, and Raytheon. These world-leading technology companies can marshal tens of thousands of talented resources to establish and serve small, medium, and large C3.ai customer relationships at global scale.

We form go-to-market and product co-development alliances with our partners that combine our AI expertise and technology with our partners' deep domain expertise to bring next-generation C3.ai solutions to joint customers. Our partnerships include strategic alliances across four categories:

- *Industry Partners*. Each industry partnership focuses on a key vertical. We have formed global strategic alliances in the energy industry with France-based global energy leader ENGIE (also a customer); in oil and gas with Baker Hughes, a global leader in oilfield services (also a customer); and in financial services with FIS, leading technology provider to the global financial services industry; and in the U.S. Federal and aerospace sectors with Raytheon, one of the world's largest aerospace and defense manufacturers.

- *Hyperscale Cloud and Infrastructure Partners*. We have formed global strategic go-to-market alliances with hyperscale cloud providers including Amazon, Microsoft, and Google. In addition, we have strategic alliances with leading hardware infrastructure providers to deliver our software optimized for their technology. These partners include Hewlett Packard Enterprise and Intel.

- *Consulting and Services*. We have formed a global strategic go-to-market alliance with IBM Global Business Services, who employs more than 100,000 service professionals. We have also established partnerships with select specialized systems integrators that provide application design and development, data engineering, data science, and systems integration services, including Aubay, BGP, CMC, Data Reply, Infoedge Technology, Informatica El Corte Ingles, Intelia, Neal Analytics, Ortec, Pariveda, SCAP, and Synechron. These alliances are focused on helping organizations accelerate their Enterprise AI and digital transformation programs.

- *Independent Software Vendors*. Our ISV partners develop, market, and sell application solutions that are natively built on or tightly integrated with the C3 AI Suite. The C3 AI Suite enables ISVs to deliver AI capabilities to their installed user base that enhance or complement existing ISV application functionality. As of September 2020, ISV partners include ENGIE, FIS, and Ortec.

46.     The statements referenced in ¶¶ 42-45 were false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  The Offering Documents made false and/or misleading statements and/or failed to disclose that: (1) the Company's partnership with

Baker Hughes was deteriorating; (ii) the Company's was employing a flawed accounting methodology to conceal the deterioration of its Baker Hughes partnership; (iii) the Company faced challenges in product adoption and significant salesforce turnover; (iv) the Company overstated, inter alia, the extent  of its investment in technology, description of its customers, its total addressable market ("TAM"), the pace of its market growth, and the scale of alliances with its major business partners; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**<u>False and Misleading Statements During the Relevant Period</u>**

47.    On December 9, 2020, the Company's Class A common stock began publicly trading on the NYSE pursuant to the false or misleading statements or omissions in the Offering Documents, as referenced in ¶¶ 42-45, *supra*.

48.    On March 1, 2021, the Company issued a press release reporting the Company's third quarter fiscal 2021 results.  The press release stated:

> "We continue to establish our leadership as the only enterprise AI software pure play," said CEO Thomas M. Siebel. "This is a large and rapidly growing market; we continue to innovate; we continue to expand our market-partner ecosystem and associated distribution capacity; and we continue to demonstrate technology leadership. I believe that we are increasingly well-positioned to establish a global market leadership position in enterprise AI software."
>
> ***
>
> - C3 AI significantly expanded its market-partner ecosystem to broaden its distribution and service network globally. In addition to expanding its market partnership activities with Microsoft, Baker Hughes, and ENGIE, C3 AI extended our relationship with Raytheon to serve the defense and intelligence communities; with FIS, a global financial services software company, to serve the banking and financial services industries; and with Infor to serve the global ERP market.

49.     That same day, the Company hosted an earnings call with investors and analysts to discuss the Company's Q3 2021 results (the "Q3 2021 Earnings Call"). During the scripted portion of the Q3 2021 Earnings Call, Defendant Siebel stated:

> We continue to expand our market partner ecosystem and the associated increased distribution capacity associated with that. We continue to demonstrate technology leadership. I believe that we are increasingly well positioned to establish a global market leadership position in enterprise AI software. So let's talk about the financial highlights. All in all, it was a strong third quarter. Revenue in the third quarter was $49.1 million. $42.7 million of that was subscription revenue, an increase of 23% from a year earlier.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

50.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

51.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

52.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

53.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

54.     The Company Board is currently comprised of Defendants Siebel, House, Levin, McCaffery, Rice, Sastry, Sewell, Ward, Davis, and Snabe. Thus, Plaintiff is

required to show that a majority of the Demand Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

55.     The Individual Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its financial results and future prospects.  Because of their advisory, executive, managerial, and directorial positions with the Company, the Individual Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

56.     The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

57.     The Individual Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

58.     The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

59.     The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

///

60.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Individual Defendants are unable to comply with their fiduciary duties and prosecute this action.  They are in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

61.     Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## DEFENDANTS ARE NOT INDEPENDENT

**Defendant Siebel**

62.     Defendant Siebel is the CEO of the Company.  Defendant Siebel is also the Chairman of the Board of the Company.

63.     Defendant Siebel is not disinterested or independent, and therefore, is incapable of considering demand because Siebel (as CEO) is an employee of the Company who derived substantially all of his income from his employment with the Company, making him not independent.  Further, Defendants House, Sewell and Ward, as members of the Compensation Committee, determine Defendant Siebel's compensation, and Defendant Siebel would never consider suing the members of the compensation Committee – the body that determines his salary.  Moreover, Defendant Siebel cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

64.     This lack of independence and financial benefits received by Defendant Siebel renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

65.     Defendant Siebel is also a defendant in the Securities Class Action.

///

66.     Defendant Siebel also owns 30,999,359 shares of Company stock (66.3% total voting power).

67.     9,216 shares of Class A Company common stock and 500,000 shares of Class B common stock are held by Defendant Siebel by irrevocable proxy pursuant to a voting agreement between Defendant Siebel and Defendant House.

68.     As both Defendant Siebel and Defendant House are financially intertwined, demand on them is futile.

**Defendants Siebel, House, McCaffery,**

**Raj, Rice, Sastry, Sewell and Ward**

69.     Defendants Siebel, House, McCaffery, Rice, Sastry, Sewell and Ward are defendants in the Securities Class Action.

**Defendants McCaffery, Levin and Davis**

70.     Defendants McCaffery is the Chairman of the Audit Committee and Defendants Levin and Davis are members of the Audit Committee.

71.     Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated by the Company as alleged herein, and otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Additionally, these

72.     Based thereon and for other reasons described herein, Defendants McCaffery, Levin and Davis face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Information As To Demand Futility**

73.     In June 2019, the Company entered into agreements with Baker Hughes under which Baker Hughes received a three-year subscription to use the Company's software for internal use and development of applications on the C3 AI Suite, as well as the exclusive right to resell the Company's offerings worldwide in the oil and gas market and non-exclusively in other markets.  This arrangement was revised in June

2020 to extend the term to a total of five years with an expiration date in the fiscal year ending April 30, 2024 and to modify the annual contractual amount of Baker Hughes' commitments to $53.3 million, $75.0 million, $125.0 million, and $150.0 million, which are inclusive of their revised direct subscription fees of $27.2 million per year over the fiscal years ending April 30, 2021, 2022, 2023, and 2024, respectively. During the fiscal year ended April 30, 2021, the Company recognized total revenue of $55.9 million related to this arrangement. Under the joint marketing arrangement, the Company is obligated to pay Baker Hughes a sales commission on subscriptions and services offerings it resells in excess of these minimum revenue commitments. The Company recognized $8.3 million of sales commission as deferred costs during the fiscal year ended April 30, 2021 related to this arrangement.

74.     Former Director/Defendant Simonelli serves as Chairman, President, and Chief Executive Officer of Baker Hughes. The Company entered into a voting agreement with Defendant Siebel and Baker Hughes, which provided that the Company would nominate and Defendant Siebel would vote all shares held by him and his affiliates so as to elect one individual designated by Baker Hughes.  This voting agreement terminated in connection with the Company's initial public offering.

75.     The Company receives significant income from Baker Hughes and no current director of the Company will sue Former Director/Defendant Simonelli and jeopardize that substantial income derived from Baker Hughes.

### FIRST CAUSE OF ACTION

### (Against The Individual Defendants for Breach of Fiduciary Duties)

76.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

77.     The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

///

78.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

79.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

80.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

81.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against The Individual Defendants for Gross Mismanagement)

82.    Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

83.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

///

///

84.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

85.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

### THIRD CAUSE OF ACTION

### (Against The Individual Defendants for Abuse of Control)

86.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

87.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

88.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

89.    The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

### FOURTH CAUSE OF ACTION

### (Against The Individual Defendants For Unjust Enrichment)

90.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

91.    During the Relevant Period, the Individual Defendants received bonuses, stock options, and/or similar such compensation from the Company that were tied to the

financial performance of the Company. The Individual Defendants were unjustly enriched thereby.

92.     To remedy the Individual Defendants' unjust enrichment, this Court should order them to disgorge their unjustly obtained bonuses and compensation.

93.     The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

## FIFTH CAUSE OF ACTION

**(Against Defendants Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward for Contribution Under Sections 10(b) and 21D of the Exchange Act)**

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

95.     C3.ai and Defendants Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward's willful and/or reckless violations of their obligations as officers of C3.ai

96.     These Defendants, because of their positions of control and authority were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

97.     Accordingly, Defendants Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward are liable under 15 U.S.C. § 78j(b), which creates a private

right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

98.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Siebel, Barter, House, Levin, McCaffery, Sastry, Sewell, Simonelli, and Ward.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1  Dated: May 23, 2022

2                                        **MAGNANIMO DEAN LAW, APC**

3

4                                        By: _Lauren A Dean_

5                                        Lauren A. Dean, Esq. (SBN 174722)
                                         5850 Canoga Avenue, Suite 400
6                                        Woodland Hills, CA 91367
                                         Tel: (818) 305-3450
7                                        Email: lauren@magdeanlaw.com

8                                        Thomas J. McKenna
9                                        Gregory M. Egleston
                                         **GAINEY McKENNA & EGESTON**
10                                       501 Fifth Avenue, 19th Floor
                                         New York, NY 10017
11                                       Phone: (212) 983-1300
                                         Fax: (212) 983-0383
12                                       Email: tjmckenna@gme-law.com
13                                       Email: gegleston@gme-aw.com
14
                                         ***Counsel for Plaintiff***
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**VERIFICATION**

I, NAREN SURI, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of C3.ai, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of C3.ai, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on April 26th, 2022.

NAREN SURI

1

Scanned with CamScanner